738

No. 30,798

F. L. Elliott, *Appellee,* v. The State Highway Commission and The Shell Petroleum Corporation, *Appellants.*

(28 P. 2d 960.)

Opinion filed January 27, 1934.

*Wint Smith,* assistant attorney-general, *O. W. Lomax,* of Topeka, *H. W. Goodwin, W. H. Schwinn,* both of Wellington, *Albert Faulconer, Kirke W. Dale* and *C. L. Swarts,* all of Arkansas City, for the appellants; *Joe T. Dickerson* and *George W. Cunningham,* both of Tulsa, Okla., of counsel.

*J. T. Boyle, W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *Wm. E. Cunningham,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

Burch, J.: The action was one for damages for injury to person and property when plaintiff's automobile went off the road at an S curve and into a drainage ditch at the side of the road. Defend-

ant, the state highway commission, was charged with negligence in suffering a chuck hole, which deflected plaintiff's automobile, to remain in the road, and in other respects. Defendant, the Shell Petroleum Corporation, was charged with negligence in maintaining an exposed pipe line across the ditch, which plaintiff's automobile struck. Plaintiff recovered against both defendants, and they appeal.

The curve in question is just west of Oxford, on the highway between Wellington and Oxford. A representation of the curve with some additional data sufficient for present purposes, follows (see page 740):

We shall be principally concerned with what may be called the west curve. The highway was an improved highway, but the sand and gravel with which it had been surfaced were somewhat worn off on the curve. Going east it was upgrade from the beginning of the curve to the pipe line and some distance beyond. The curve was a slightly banked curve, sloping toward the south. On the north side of the curve was a drainage ditch made in original construction of the highway. Just east of the pipe line the ditch was rather shallow. Just west of the pipe line it was deeper.

In June, 1927, the Shell company installed a four-inch pipe line for transportation of natural gas beneath the highway and below the bottom of the ditch. In 1928 an oil well was located north of the highway, and the pipe line interfered with the cellar pit. Therefore a swing to the right was put in. The old line was cut, and a T was put in, top down. The north end of the T was plugged, and the south end was attached to the pipe under the road. An L was then put on, and a connection was made above the old pipe with a new pipe line which ran underground northeastward to the right of the oil well cellar pit.

There was testimony for plaintiff that, beginning three or four feet east of the pipe line and extending from six to ten feet west of the pipe line, the south bank of the ditch had caved in some two to four feet toward the center of the road, due to action of water in the ditch. Along the edge of the cave-in were weeds and other vegetation. Next to the weeds on the south was a ridge of sand and gravel thrown up by the road maintainer, which passed over the road several times a week. The morning after the accident this ridge was twelve to fourteen or sixteen inches wide and six to eight inches high.

Scale - 1"= 80 Ft

The accident occurred on November 15, 1930, in the evening after dark. It had been rainy weather, and had rained during the day, but was not raining when the accident occurred. Plaintiff was driving a model A 1930 Ford sedan. The car was equipped with bright lights, and the windshield was clear. Plaintiff's wife was with him. Plaintiff had been over the road before, the last time perhaps within ten days or two or three weeks, and knew of the curve. On this occasion he approached the curve from the west, and saw the S curve sign. Then he saw standing water ahead of him, probably covering the south side of the highway and extending eastward for a distance variously estimated. The curve in the highway begins 164 feet west of the pipe line. From the beginning of the curve to the pipe line the highway rises five and two-tenths feet, and plaintiff's brief properly asserts this slope would be a precarious place for water to stand.

Plaintiff pulled around the pool of water until he was on the left side of the road just a little. It looked like everybody was using the north side of the road, there were tracks all around there, but no approaching headlights were observable. Plaintiff reduced speed to twelve or fifteen miles per hour—Mrs. Elliott said ten or twelve miles per hour—and proceeded eastward, intending to get back on the right-hand side of the road after passing the water. Plaintiff testified that after passing the water the road was not slick, the road had been sanded, and there were sand and gravel there. Mrs. Elliott testified the road was firm, and said she did not know why her husband did not turn back into the south side of the road after passing the water. He testified the right-hand side going east was wet, looked smooth, and a person would have to stay on the upper part to keep from slipping into the (south) ditch.

Plaintiff testified that as he proceeded toward the place where the pipe line crossed the ditch there was no change in appearance of the ground. Mrs. Elliott gave testimony to the same effect. As plaintiff looked through his clear windshield, his bright lights disclosed to him the ridge of gravel and sand at the left side of the road, and grass and weeds. Plaintiff had seen ridges along the sides of highways, made by maintainers. It was a common thing, and he had had experience with them. He had run into the edge of sand and gravel, and had to be careful to keep his car from going sidewise.

After seeing the gravel, plaintiff struck a chuck hole in the road, fifteen feet, or from twleve to fifteen feet, or ten or twelve feet, from the pipe line. In plaintiff's direct examination appears the following:

"Q. What did you do when you got to that pond of water? A. I pulled to the left to keep out of it.

"Q. And at the same time you hit that hole, is that right? A. Yes."

As indicated, this was impossible. Turning out for the water and hitting the chuck hole could have seemed to be practically simultaneous only in case plaintiff were driving at a high rate of speed.

The left (front) wheel hit the chuck hole. When plaintiff struck the chuck hole, slush went all over his windshield. It splashed sloppy water all over the windshield and lights; just splashed water everywhere. He felt the car pull to the left. Then he heard a big crash when he struck the ridge of gravel, and he knew he was in the ridge of gravel. Then the car went into the ditch.

Mrs. Elliott said they struck a chuck hole filled with a mushy substance. She said there was no water in the chuck hole. She did not mention water or slush striking the windshield or lamps, or mention the car pulling to the left while in the chuck hole. She said that immediately there was a kind of shadow which they afterwards discovered was a ridge of gravel, which extended quite a distance down the road. Immediately the car pulled to the left, and there was a terrible crash. She did not inspect the scene of the accident that night, as her husband did, and she explained failure to observe the ridge of gravel under the bright lights of the car by the fact she was not looking for anything like that, and she did not see weeds until the next day.

The morning after the accident witnesses for plaintiff examined the premises where the accident occurred. One of them had a folding rule with him, and proposed they measure the ditch. He said the ditch was forty-eight inches deep, measured from the level of the road to the bottom of the ditch at a point six or eight feet west of the pipe line. The ditch was about eight or ten feet wide at and beneath the lower pipe, and was eight or ten feet wide at the top. The lower pipe was a four- or five-inch pipe, and the top of it was sixteen inches above the bottom of the ditch. Subsequently he said the top of the lower pipe was practically eighteen inches above the bottom of the ditch, and it was twenty-four to twenty-six to twenty-eight inches from the top of it to the top of the road. Eight to ten feet of the lower pipe were exposed in a

north-and-south direction. The upper pipe came in on an angle, and three to five feet of it were exposed.

Another witness for plaintiff said the ditch was seven or eight feet wide and about four feet deep. Seven or eight feet of the top pipe were exposed, and a little less of the lower pipe. The lower pipe was a foot from the bottom of the ditch. The upper pipe was about a foot above the lower pipe.

Another witness for plaintiff said the ditch was about four and one-half feet deep, the lower pipe was about knee high from the bottom of the ditch, the top of the upper line was about eleven inches higher, and the upper line was about two feet below the level of the road.

There was testimony for defendants which placed the distance from the bottom of the ditch to the top of the upper pipe at twenty-eight and one-half inches.

A witness for plaintiff, who looked the situation over on the night of the accident, after the accident occurred, said he could see the tracks of plaintiff's car where it hit the sand, pulled over "that way" (to the left), and went from the east side of the chuck hole to the bank of the ditch. He could see where the left wheels of the car had gone to the bottom of the ditch, whether clear down he did not remember.

A witness for plaintiff, who inspected the tracks of the car the morning after the accident, testified the left rear wheel started off into the ditch at a point about five feet west of the pipe line. However, in response to pointed questions, this witness testified the car came into the ditch and got the left front wheel down to the bottom of the ditch. Then with the right front wheel up on the side hill of the ditch (cave-in), the car drove along a distance of four or five feet to the pipe line. The right rear wheel held up on the cave-in until it went over the pipe line.

There was no testimony relating to height of the front wheels of plaintiff's car. Perhaps it was assumed the jury would know the approximate height. Having no information on the subject, and having some curiosity about it, the court caused inquiry to be made of a dealer, who reported after measurement that the wheels of a 1930 model A Ford were twenty-nine inches high. As will appear later, the information is of no consequence in decision of the case.

Plaintiff testified as follows:

"Q. What part of this car did you say first hit the pipe? A. Both at once.
"Q. Well, what part? A. Both front wheels.
"Q. Both front wheels? A. Yes."

When asked if the front end of the car struck the pipes, plaintiff retreated to, "I don't know what happened." He did, however, purport to know this happened: The car just crashed, there were two big jerks, and it stopped. There was no injury to the front of the car—bumper, fenders, radiator, lamps, axle, wheels, front-wheel brakes, or steering gear.

When the car stopped it was lying on its left side on the left side of the ditch, east, or properly, southeast of the pipe line. Plaintiff examined the scene of the accident with his flashlight soon after the accident occurred. He testified the rear wheels of the car were eighteen inches east of the pipe line. The shock knocked off Mrs. Elliott's glasses and, in getting out of the top door, as the car lay on its side, the occupants stepped on the glass of the left door. There was testimony that Mrs. Elliott's glasses and the broken glass of the left front door were found eleven feet southeast of the pipe line. There were other estimates of distance of the car from the pipe line.

There was testimony there was a mark on the upper pipe line where the car went over it. Beginning at a point about beneath the operator's feet and extending to the rear, the under side of the car was badly damaged. The following is the list of material used in repairing the car:

"One gear shift, 1 gear-shift housing, 1 running board and 1 fly-wheel housing, 1 clutch housing, 1 transmission case, reverse idle gear, reverse idle-gear housing, 1 snap ring, transmission slide gear, 1 gear-shift plunger, transmission shifting fork, 1 rear axle, 1 rear-axle housing, universal joint-bearing cap, 1 bolt, 1 main leaf, 1 main rear spring, 1 rear spring clip, grease retainers, emergency brake lever, radius rod bolt, 2 running-board arms, brake rod, shift spring, 1 brake cross shaft, 1 brake cross-shaft clamp, 1 door glass, 1 engine support, 2 bolts and nuts."

There was testimony by the man who made the repairs that the left rear wheel was caved in, but the repair bill did not include wheel replacement or repair. There was testimony the frame of the car was damaged, the expense of repairing it would be about $75, and it was not repaired.

Defendants contend it was physically impossible for the accident to occur in the manner described by plaintiff and his witnesses. Be-

sides that, defendants have a very simple explanation for plaintiff's striking the pipe line with the tremendous momentum which the car indisputably displayed—excessive speed. The court does not deem it necessary to discuss these subjects.

The water, extending for some distance to the foot of the curve, had nothing to do with the accident except to furnish occasion for plaintiff to take the north side of the road. If the water had extended some distance to, and then twenty-five or thirty feet up the incline, plaintiff would still have had more than one hundred feet within which to return to the south side of the road, and there was no complaint by plaintiff that the road was too narrow alongside the water. He said that in avoiding it he turned to the center of the road or a little over the center on the left side.

There were various measurements and estimates of the width of the highway. Engineers of the state highway commission, who made measurements at periods after the accident, found the width of the traveled way at the pipe line to be thirty-four feet, and thirty-five feet, and at the west S curve sign to be thirty feet. Nick Carter, an employee of the highway commission, called as a witness for plaintiff, estimated the width of the highway approaching Oxford at twenty-eight to thirty feet. These were standard widths when the highway was improved.

Plaintiff depended largely on two witnesses to establish topographical details, John Binkey and F. C. Deal. Deal testified as follows:

"In my judgment it is a sixty-foot road with a forty-foot grade on it, or a forty-five-foot grade on it, something like that. . . I would say that the chuck hole was about four feet back of the cave-in; that is, from the edge of the ditch to the south side of the chuck hole. I would think that there was about thirty-six feet of highway at this point that was free of any obstruction or defect."

Binkey testified as follows:

"I have seen ridges of sand and gravel such as was there on other gravel roads during my travels. It was pretty close over on the north side of the highway. I don't know how wide the road is. It is a good wide road. There is lots of room for travel on the road if there isn't anything in the way. The ridge of gravel and sand left plenty of room on the highway for travel."

The jury found the traveled portion of the highway at the point where plaintiff's car left it was twenty-two feet, a finding not supported by any evidence.

Plaintiff's brief contains the following statement:

"When the width of this pool of water and the depression is substracted from any width of the traveled portion of the highway sustained by the evidence, there was less than thirteen feet of the traveled highway suitable for public travel."

The width of the pool of water may not be substracted from width of the highway at the chuck hole, or at the cave-in, or at any place except where the water stood; and the conclusion that there were less than thirteen feet of traveled highway suitable for public travel is not sustained by any evidence.

Having gotten by the water as a supposed factor of the accident, we now reach the chuck hole. The superficial area was variously estimated by plaintiff and his witnesses: twelve to fifteen inches by three or four feet; two feet by two feet; three or four feet by five feet; four feet by five or six feet.

Plaintiff and Mrs. Elliott said that at the time of the accident the chuck hole was the same color as the remainder of the road, and bright lights would not reveal its presence. Mrs. Elliott said it looked to be of the same substance as the road. Deal, who saw the place the morning after the accident, said the chuck hole was no darker than the rest of the road. Some other witnesses for plaintiff said the color was darker than the remainder of the road.

The content of the chuck hole was variously described: mud and slush; slushy, muddy water, more like thin cement; slushy stuff; sloppy water; water and mud; sloppy, thick like mud; like mortar, heavy and gobby. It was plaintiff who said the chuck hole was three or four feet wide and over five feet long. Afterwards he said four feet by five or six feet, and it was plaintiff who said the hole was filled with a substance like mortar, heavy and gobby.

Plaintiff said that when he examined the place with his flashlight immediately after the accident, he had thrown all the water and mud out of the hole, which was quite a feat for two wheels of a Ford car going twelve to fifteen miles per hour. Seeing the hole empty, plaintiff had opportunity to observe whether there were banks, and if so whether they were steep or sloping; what the depth of the place was; and whether the whole area of twenty to twenty-four square feet was of uniform depth. If plaintiff made these observations, he did not condescend to tell the jury about them. He expressed a judgment as to depth of the pond at the foot of the curve, but not as to depth of the chuck hole. Nobody knew the depth of the chuck hole. At first John Binkey, who saw the place the next morning, said the

chuck hole was five or six inches deep, but he said he did not measure it or examine it, and did not know whether it was one inch or eight inches deep. Binkey said the chuck hole was about level with the road, and looked like it was just a softer place than the rest of the road.

Deal testified as follows:

"The chuck hole was about three or four feet long ànd probably fifteen inches wide. It looked more like the trucks had worn it out and got the hole started and knocked it out. It was a low place filled with this slushy stuff. We saw where the car hit it and slushed it out. We couldn't see the bottom of it, and I don't know how deep it was."

"This little chuck hole was there. It was nearly level with the rest of the road, but it was a thin formation of stuff. I didn't examine the stuff. I didn't care to. I just looked at it. Cars were going back and forth, and you could see where it had been splashed out."

Manifestly the place had filled after the accident occurred, and, with cars going back and forth, just how Deal could distinguish a splashing out by a Ford sedan the night before is not apparent and was not explained.

There is no other testimony which adds appreciably to the information the court and the jury possessed concerning this chuck hole. The highway commission contends the testimony did not disclose a defect in the highway, within the meaning of the statute imposing liability for highway defects.

In several cases the court has declined to interfere with a finding by the jury that the highway was defective. In each case the claimed defect was described.

In the case of *Collins v. State Highway Comm.*, 134 Kan. 278, 5 P. 2d 1106, there was a rut adjoining the concrete slab with which the highway was paved. The rut was from fifty to seventy-five feet long, perhaps eighty to ninety feet long, was eighteen to twenty inches wide, and was from six to twelve inches deep for its entire length. It was from twelve to fourteen inches deep at the deepest place. It was so deep at the place where the wheels of the Collins car went into it that the tie rod of the car was bent.

In the case of *Williams v. State Highway Comm.*, 134 Kan. 810, 8 P. 2d 946, the highway had been surfaced with sand and gravel, and at the time of the accident was dry. Near the top of a hill were two holes in the surface. One was two and one-half feet long, ten inches wide and five inches deep. Near it was another hole two feet long, ten inches wide and four inches deep. These holes were near

the center of the highway. As an automobile was driven down the hill, a front wheel went into the first hole, and the car was deflected to the right. Then a wheel dropped into the other hole, the car was deflected to the left, and the driver lost control.

In the case of *Collins v. Highway Comm.*, 138 Kan. 629, 27 P. 2d 216, the highway was graveled and was dry. About two feet from the center of the traveled way was a hole two or three feet long, eighteen inches wide and six to eight inches deep. As motor vehicles crossed the hole, the jolt would make a noise which could be heard at a nearby farmhouse; and a witness testified that while he was going home the evening before the accident his car went into the hole and was overturned.

In this instance the descriptions of the physical characteristics of the place were such that nothing can be affirmed concerning it except that it was a depression containing soft substance. No witness knew and the jury did not know how much the road surface was depressed, whether slightly, considerably, or deeply. There was enough soft material to splash. That is of such common occurrence in wet weather on roads surfaced with sand and gravel that nobody regards the circumstance as indicating defect. There was no evidence of shock to the car in entering or leaving the depression. Its only effect, if it had any effect, was that plaintiff felt the car pull to the left, something which may occur on any sand and gravel road, wet or dry. Plaintiff said his bright lights did not disclose the depression, and when we turn to characterizations by his witnesses of what they saw, Binkey said it looked like it was just a softer place than the rest of the road; Deal said there was a little low place, a chuck hole, and he called it "this little chuck hole."

In response to a leading question, plaintiff said hitting the chuck hole pulled him to the left so that he hit the sand (gravel ridge). But before that the following occurred:

"Q. Anyway, something came up out of this hole and so covered your windshield that you couldn't see the road? A. Yes.

"Q. What did you do then? A. I felt the car pull to the left.

"Q. What do you say now, in your judgment, made your car pull to the left? A. It was in this hole, I suppose; maybe it was part of this rut, or for some unknown reason it went out of the bank and caught this sand."

Resolving in plaintiff's favor the doubt in his own mind respecting what caused the car to pull to the left, the court is unable to discover any basis for charging the state highway commission with

violation of statutory duty in the matter. The term chuck hole, as used in the United States, means a deep hole in a wagon rut. (Webster's New International Dictionary, 1933.) It is proper to extend the meaning to include a deep hole in a vehicle rut. Plaintiff advanced his case at the trial by simply calling the place a chuck hole. He made no gain by proof, and the court holds there was no substantial evidence the highway was defective because of existence of the so-called chuck hole.

The road maintainer passed over the curve three times a week, and in the ordinary course of road maintenance threw up a ridge of loose gravel and sand, at the north side of the curve, as it did all along the road. In this instance some of the witnesses said the ridge contained dirt and mud. As indicated above, the ridge was twelve to fourteen or sixteen inches wide, and was six to eight inches high. It would be idle to say this ridge constituted a highway defect, and it cannot be considered with the chuck hole, which was not a defect, to make the highway defective.

Beyond the gravel ridge was the drainage ditch, a necessary feature of highway construction at that place, which had existed since the highway was improved. A drainage ditch does not of itself constitute a highway defect, but plaintiff contends the highway was defective because there was no guard rail or post or other warning sign to indicate plaintiff should keep to the traveled portion of the highway.

There was a difference of opinion among plaintiff's witnesses regarding nearness of the edge of the cave-in to the gravel ridge. Plaintiff gave some testimony to the effect the ridge curved to the south around the cave-in, but he admitted this was subsequent to time of the accident. Mrs. Elliott said the ridge of gravel followed the contour of the road. John Binkey said the gravel ridge was pretty close over to the north side of the highway and pretty close to the cave-in, practically right up against it. Deal said the ridge of gravel was between three and four feet from the cave-in. Ralph Binkey, son of John, said there were approximately two feet of weeds and vegetation between the traveled part of the road and the shoulder of the road where it commenced to slope off.

Operation of the road maintainer was described. The blade catches a little of the surfacing, fills depressions, and works the surplus to the side of the road. The court recalls no testimony that grass and weeds could grow any place to which the end of the blade

extended. The surplus material, sliding off the end of the blade, forms what is called a windrow at the side of the road. The dimensions of the windrow along the north side of the curve have been stated. The court recalls no testimony that weeds grew from beneath this accumulating ridge composed of gravel and sand and dirt and mud.

If, as plaintiff testified, this windrow was so close to the cave-in that the material trickled down the side of the cave-in, there was no place for Ralph Binkey's weeds to grow, or for any weeds to grow between the traveled way and the cave-in. Plaintiff said they grew in the cracks of the cave-in. Ralph Binkey testified there were no weeds down the bank of the cave-in. Deal merely said there was some vegetation there.

Plaintiff produced a sketch, not drawn to scale, of what some of his witnesses said was a fair representation of the place, but some of its features were not agreed to. It was used before the jury to aid in the examination of witnesses, and was introduced in evidence. The sketch was on a sheet of paper slightly less than eighteen by twenty-four inches, and was done in colors. It was not signed by the artist, and no one appeared at the trial to claim credit for it. It bore a legend that the red color represented the pipe line, blue represented the pond of water, brown the dirt banks and grading, and yellow the loose gravel. The legend did not mention the chuck hole, but it was in the picture, done in black. There was neither legend nor painting of weeds beyond the gravel. The grouping was such that the gaze of a juror across the blue pond, and across a bit of highway between the pond and the chuck hole not as wide as the chuck hole was long, rested on the black chuck hole, the yellow gravel, the brown cave-in, and the red pipe line. The great pipes hung across a chasm of cave-in and ditch, and were lost in the precipice of the north side. They towered to a height practically equal to the distance of the pond from the chuck hole. A length of the lower pipe was visible for a distance greater than that from the pond to the chuck hole. If that were a fair representation of the place, the cave-in, the ditch, and the pipe line would shout their presence to any automobile driver approaching the curve from the west with bright lights, and installation of any warning barricade, or sign, or red light, would have been a waste of public money.

Perhaps the exaggerations of the travesty by way of sketch which has been referred to may have emphasized the importance of some

screen to conceal the ditch, the cave-in, and the pipe line from plaintiff as he approached them, and there was much testimony on the subject of weeds. The testimony will not be reviewed. Plaintiff takes this position in his brief: The ditch, cave-in and pipe line were concealed from plaintiff by a rank, luxuriant growth of sunflowers, ragweeds, and horseweeds, on the shoulder and bank of the ditch, and in the cave-in and the ditch. Without interpreting the words "rank" and "luxuriant," there was testimony warranting an inference there were weeds and other vegetation on the shoulder and bank of the ditch. Plaintiff admitted he saw weeds, but he minimized apprehension of them by saying the gravel ridge cast a shadow. If, as the testimony indicated, some of the weeds rose to a height of two or three feet, and others to a height of one and one-half to two feet, they were several times higher than the ridge of gravel, and plaintiff's brief in this court says the weeds cast a shadow.

With reference to the subject of shadow, plaintiff testified:

"Q. Then you could see the weeds, couldn't you? A. The gravel looked like a black bank there."

There was more equivocation, but plaintiff was chargeable with seeing what he could see, and the weeds were perfectly manifest.

Plaintiff knew about this curve. He knew he was on the north side of the road. He knew the weeds and gravel ridge were on his left hand, and the black bank which he saw, backed by the wall of tall weeds, which in fact unmistakably marked the north limit of the traveled part of the road, gave him all the warning a prudent driver, driving up hill on a banked curve, needed respecting that limit.

Plaintiff contends existence of the cave-in, the pipe line, and the ditch, all concealed by weeds, made the highway defective, under the decision in the case of *Watson v. Parker Township,* 113 Kan. 130, 213 Pac. 1051. In that case the ditch was not a highway drainage ditch at the side of the road. It was a private ditch dug within the limits of the highway. The ditch narrowed the traveled portion of the highway to thirteen and one-half feet. The ditch was deep, and was thickly covered with weeds. While driving his car southward on the west side of the traveled way, Watson became apprehensive of a collision with a car approaching from the south at a high rate of speed, and veered to the right. The ditch was only two feet away, and the car went into it. It was held the question

whether the highway was defective was one for determination by the jury. We have no such case here.

In the Watson case the jury inspected the scene of the accident. In this case the jury inspected the scene of the accident, which occurred November 15, 1930. Plaintiff makes much of the knowledge gained by the jury by view of the premises.

The trial commenced on October 26, 1931, and the verdict was returned November 9, 1931. The resident engineer of the highway commission testified the road had been resurfaced in January, 1931. Deal testified:

"The cave-in has been all filled up to the elbow on the pipe line. The bottom of the ditch has also been filled up to the lower pipe. The chuck hole has been done away with. The road has been sanded where the pool of water was."

Ralph Binkey testified:

"There has been some change in the condition of the pipe, the ditch, the gravel, the chuck hole, the pool of water, since the night of the accident. Along the cave-in it has been filled up, raised a little perhaps. The pipe still exists there, but it has been filled up around it some, and the chuck hole filled up . . ."

There was testimony concerning recent digging about the pipe line, and there is no contention there were any weeds in sight when the jury was there. Therefore, the jury was obliged to depend on the testimony for information respecting all the conditions relied on as chief factors of the accident.

Plaintiff contends the jury was authorized to find the curve was a dangerous curve by taking into account, in connection with the other evidence, the fact that vehicles frequently went into "the" ditch at that curve.

The fact that an automobile departed from the traveled way means nothing with respect to existence of defect unless the circumstances are known. Always there is the question of speed. In this instance the testimony relating to other cars going into the ditch descended to this level:

"I heard the boys say there was a car that went into the ditch last night."

It had been raining for some time before the accident occurred. The general condition of the road was muddy. There was evidence the ground was soft and slippery, and that it was very slippery. On the evening of November 15, and just before plaintiff's accident occurred, a truck slipped off the south side of the road into the south

ditch, and there were some other authentic accounts of vehicles slipping off the road.

The ditch at the south side of the road was not described, and there is no contention it should have been fenced, even if the road were slippery. Deal testified the ditch on the north side of the road east of the pipe line was rather shallow, and there was an abrupt pitch after the pipe line was passed. There was testimony for defendants that the area drained by the ditch was very small. A witness for defendants testified the ditch east of the pipe line was about a foot deep. Another witness said it was about one and one-half feet deep, and within about 100 yards shallowed out to level. Another said the ditch was a bit shallow east. Another said that east the ditch was not very deep, and shallowed out from there on. There was no rebuttal evidence on the subject, and there was no evidence warranting an inference that the north ditch east of the pipe line constituted such a peril to traffic that it should have been guarded.

It will be recalled that both plaintiff and Mrs. Elliott testified that the north side of the road, which they were using, was not slippery. It was sanded and graveled and firm. Only the south side of the road was slippery, and Deal said that the next morning after the accident cars were going back and forth. Plaintiff and his wife should have known the condition of the road, and if their testimony was approximately true, the slippery condition of the highway had no causal connection with their going into the ditch. Leaving their testimony at one side, there was no eyewitness to or reliable report of any vehicle slipping upgrade toward the pipe line, up the bank of the curve, over the ridge of gravel, and through the weeds, into the ditch.

The result is, the state highway commission rested under no duty to barricade the ditch in the vicinity of the pipe line because of the slippery condition of the highway in wet weather.

Employees of the Shell company testified that in order to install the T for the pipe-line swing, an excavation was made in the shoulder of the highway to the depth of six to ten inches. The earth was replaced, and was tamped down hard. There was no other evidence on the subject. Plaintiff's evidence was that action of water flowing down the ditch was affected by the pipe line, and caused the cave-in. If so, the ditch was still a drainage ditch at the north side of the highway, beyond the traveled portion of the road.

The pipe line was not in itself a structure which menaced travel on the highway. It was so located it did not obstruct, inconvenience, or endanger public travel. The chance that travelers from the west, the class to which plaintiff belonged, might get over into the ditch where the pipe line crossed it, was so remote that neither the highway commission nor the Shell company was required, in exercise of ordinary, reasonable foresight, to protect against it.

In support of the verdict against the Shell company, plaintiff cites the case of *Durst v. Wareham,* 132 Kan. 785, 297 Pac. 675, a nuisance case. In that case, Wareham maintained on his own land next to an alley an old shed, the roof of which was supported by a post which rested on a concrete floor and was not braced or fastened. The alley was covered with snow and ice. Durst was riding a motorcycle. When opposite the post, the front wheel of the motorcycle dropped into a rut, the rear wheel skidded, and the motorcycle headed for the post. The motorcycle struck the post, knocked it down, and the roof of the shed fell. The peril to users of the alley inhered in the nature of the structure itself. If the post had been a massive stone pillar, as rigid as the pipe line in this case, and if the motorcycle had been demolished and Durst had been injured, he could not have recovered. The distinction was indicated by the following from the opinion:

"It is not the closeness of the pitfall or dangerous structure to the highway that renders the landowner liable; rather it is the danger that the structure affords to travelers upon the highway." (p. 789.)

In the foregoing the recital of evidence ignores evidence favorable to defendants, except as indicated. The recital is not a complete statement of all of plaintiff's evidence, and on account of inherent difficulties, may not be perfectly accurate in every detail. It is, however, fairly representative of all there is in plaintiff's case, and when analyzed the evidence does not sustain the verdict against defendants. This conclusion has been reached after full consideration of the authorities cited in the briefs. It would unduly extend this opinion to review them.

The judgment of the district court is reversed, and the cause is remanded, with direction to enter judgment for defendants.

HUTCHISON, J., not sitting.